**MORGENTHAU, Director General of Railroads, v. SUGAR LAND RY. CO.**

No. 7874.

Circuit Court of Appeals, Fifth Circuit.
April 3, 1936.

R. C. Fulbright, of Washington, D. C., and Carl G. Stearns, of Houston, Tex., for appellant.

Tom M. Davis and J. H. Tallichet, both of Houston, Tex., for appellee.

Before SIBLEY, HUTCHESON, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

A decree on final hearing dismissed a bill in equity which was filed June 1, 1927, by the Director General of Railroads against Sugar Land Railway Company to obtain an account of the moneys collected by the latter during the period of federal control of railroads from January 1, 1918, to March 1, 1920, in which moneys the railroads controlled by the Director General were interested because of joint rates on the freight handled. The bill admits that Sugar Land Railway Company had made monthly divisions, but alleges that the divisions had never been fixed by the State Railroad Commission or the Interstate Commerce Commission or agreed to by any authorized agent of the Director General, and were unreasonable and unjust, and that about $122,000 would be due to the Director General on a fair accounting. The bill was dismissed on two grounds, to wit: that the court had no power to determine just and reasonable divisions of joint rates; and, if otherwise, that the divisions made were in fact just and reasonable.

The Sugar Land Railroads are short lines in Texas connecting with three larger systems. Their main business was with a sugar refinery at the town of Sugar Land, to which imported raw sugar was delivered in large quantities with freight paid at destination, and from which refined products went into intrastate and interstate commerce with freight prepaid, so that the Sugar Land Railroads habitually collected about 90 per cent. of the freight moneys. Before January 1, 1918, there were in force voluntarily established through joint rates, and agreed divisions of them.* The pleadings make an issue about it, but there cannot be any doubt that the Sugar Land Railroads were taken into federal control by the broad terms of the Presidential Proclamation of December 26, 1917, and that they remained in such control until June 25, 1918, when their control was relinquished by the Director General. The joint rates were collected and the agreed divisions of them were observed in the monthly settlements and remittances to the connecting railroads both before and after June 25, 1918, and until federal control ended, but with some protest of the divisions by agents of the Director General beginning in 1919. On February 13, 1918, the Interstate Commerce Commission of its own motion instituted an investigation into the divisions taken by the Sugar Land Railroads, but at the request of the Director General hearing was deferred and was not had until January 14, 1925. Meanwhile, after federal control had ceased and by negotiation among the interested carriers, a new basis of divisions less generous to the Sugar Land Railroads was established, effective September 1, 1920. The Interstate Commerce Commission made a decision on May 9, 1927, saying: "We have no jurisdiction to fix the divisions of joint intrastate rates. We have no jurisdiction to fix the divisions of joint interstate rates retroactively unless those rates were established pursuant to an order or finding by us, in which case we may require the adjustment of divisions from the date of filing the complaint, or date of the order of investigation, as the case may be. Section 15 (6) [Interstate Commerce Act (49 U.S.C.A. § 15 (6)]; Pittsburgh & W. Va.

* Some of the intrastate rates were imposed by the state commission.

Ry. Co. v. P. & L. E. R. R. Co., 61 I.C.C. 272. The record does not show that any one of the joint interstate rates to which the Sugar Land was a party and which were in effect during Federal control, or thereafter prior to August 26, 1920, was established pursuant to an order or finding made by us. * * * Upon the record before us we are without authority to enter an order fixing divisions between the Sugar Land and its connections prior to August 26, 1920." 126 I.C.C. 529. Divisions subsequent to that date were ordered to accord with those which by agreement had become effective September 1, 1920, and which were held to be just and reasonable. On June 1, 1927, the date of filing this bill, the Director General began before the Railroad Commission of Texas a proceeding to determine fair divisions of intrastate joint rates during the period of federal control. On January 2, 1931, a decision was made which followed the decision of the Interstate Commerce Commission in adopting the divisions' which had become effective September 1, 1920, but a rehearing was granted on a ground touching jurisdiction and no final decision has yet been had.

■ The question of the right of the District Court to proceed without a decision by the respective commissions covering the period in question upon the divisions of the joint rates is not one of jurisdiction as a federal court, but one of the equitable merits of the case. Timken Roller Bearing Co. v. Pa. R. Co., 274 U.S. 181, 47 S.Ct. 550, 71 L.Ed. 989. The federal jurisdiction is clear both because the Director General is an officer of the United States authorized by law to sue, and because the suit arises under the laws touching federal control of railroads which are pleaded in the petition. 28 U.S.C.A. § 41 (1). One phase of the pleading alleged that the Interstate Commerce Commission had fixed the interstate divisions, but it is plain that it disclaimed jurisdiction to do so. This is therefore not a case to enforce an order of the commission under 28 U.S.C.A. § 41 (27) (28), and has not the limitations as to fact finding which attach to that jurisdiction. The jurisdiction invoked is that of a court of equity to enforce a fair account from one who has received money for another, or one who has engaged in a joint enterprise with another and collected more than his share of the profits. We see no reason why the principles of equity used in such a situa-

tion, or used at law in an action for money had and received, may not be applied to two common carriers, except so far as statutes may prevent. See Atlantic Coast Line R. Co. v. Balt. & Ohio Ry. Co. (D. C.) 12 F.Supp. 711; Atlantic Coast Line Ry. Co. v. Pa. R. Co. (D.C.) 12 F.Supp. 720. But we find no need to discuss the power of a court to fix divisions where none have been established and where the commissions having power to fix them either have not acted or cannot act, because we are of opinion that the divisions originally established prior to federal control persisted, and we turn to a discussion of that point.

■ The Presidential Proclamation of December 26, 1917, establishing federal control and appointing the Director General of Railroads to exercise it, prescribed that until and except as the Director General should otherwise by order provide "the officers and employees of the transportation systems shall continue the operation thereof in *the usual and ordinary course of the business* of common carriers in the names of their respective carriers." This of itself continued in force all established rates, for rates were indispensable in the business of the common carriers, and preserved the established divisions of joint rates at least for accounting purposes between the several railroads. The Director General by his first general order of December 29, 1917, continued all officers, agents, and employees of the carriers in their regular duties, reporting to the same officers and under the same terms of employment as theretofore. He specially ordered the promotion of through routing, and that: "7. Existing schedules or rates and outstanding orders of the Interstate Commerce Commission are to be observed, but any schedules, rates or orders which may hereafter be found to conflict with the purposes of said Proclamation and with this order shall be brought immediately by wire to the attention of the Director." This confirmed the adoption of all existing schedules and rates, and looked to their change only by report to and action by the Director. General Order No. 11 was issued March 16, 1918, dealing to some extent with joint rates. These were not abolished, but were required to be followed in the billing of freight with a provision that: "10. The total freight charges as reported by destination carrier *and the divisions thereof* must be accepted by all interested carriers as final." "12 (a) Where joint through rates

are in effect, *established divisions* or any simplification thereof which may have been perfected *shall be used.*" On April 22, 1918, General Order 21 required: "3. (d) Destination carriers of the freight shall apportion and settle the revenues on interline waybills to be accounted for in May, 1918, accounts on *bases of established divisions,*" but sought to apply percentage averages after May, but these percentages were to be tested by the established divisions on request at any time, "it being intended to preserve as equitably as practicable the integrity of the revenues of individual carriers." By these orders the divisions as established were recognized and approved, although since all the earnings of the carriers under federal control belonged to the United States the divisions were not of great importance except for accounting and record purposes. On March 21, 1918, Congress passed an act by section 9 of which (40 Stat. p. 456) it was provided: "That during the period of Federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and practices by filing the same with the Interstate Commerce Commission." Congress thus recognized the existence of the former rates, and provided the method for their change. The implication is that they would remain unchanged except as altered in the way prescribed. On May 25, 1918, the Director for the President by General Order 28 exercised the power to alter the existing rates, and in order to increase railway operating revenues advanced nearly all rates 25 per cent. Some of the sugar rates here in question were raised by adding 22 cents per hundred pounds in lieu of the percentage raise. This action of the Director General again rested upon and necessarily recognized the old rates as still existing. His increases could not be applied except in connection with the former rates. On June 25, 1918, the Sugar Land Railroads were discharged from federal control. What they earned was no longer money of the United States, and the question of divisions became as practical and vital as such a question ever is among carriers. The monthly accounting continued on the same divisions basis as before, and rightly so. It may be generally true that all contracts and agreements between carriers were frustrated by federal control, which was an assumption of the railroads by

government akin to the exercise of the power of eminent domain. North Carolina R. Co. v. Lee, 260 U.S. 16, 43 S.Ct. 2, 67 L.Ed. 104. We held a coal contract to be thus frustrated except to the extent that the Director General saw fit to act under it, and that it could become binding on him so far as it was executory only by adoption. Corona Coal Co. v. Davis, Director General (C.C.A.) 20 F.(2d) 738. But rather than to allow the existing rate structure to become frustrate, the President, Congress, and the Director General, as we have seen, saw fit to adopt it in its entirety, subject to future modification. Divisions were specifically enjoined to be observed, and when the Sugar Land and other short line railroads were released from federal control, General Order 11 was for a long time neither modified nor revoked, but remained to be observed. The divisions of the rates in question were a part of these voluntary rates, and we may assume that the rates were agreed to by the carriers only in connection with and in consideration of the divisions. Compare Brimstone R. & Canal Co. v. United States, 276 U.S. 104, at page 122, 48 S.Ct. 282, 72 L.Ed. 487. We do not think the Director General's dismission of the Sugar Land Railroads from his control did away as to them with his general adoption of the joint rates and their divisions. This could be done only by positive action to that effect. There was in 1919 discontent, discussion, and negotiation by inferior officials touching the divisions, but never any positive exercise by the Director General of his power to change the rates or to recede from the divisions. On November 20, 1919, a year and five months after the short lines were discharged from federal control, General Orders 11 and 21 were canceled by General Order 64, and new instructions given for "the apportionment and settlement of freight revenues." "7. In apportioning revenues between carriers the following shall be observed: (a) When joint through rates and *agreed published divisions* or percents are in effect, *such divisions or percents shall be used.*" We think dealings with the short line railroads were included, since we discover no special orders concerning them. Indeed, the general intent to maintain for them their rates and divisions in existence at the beginning of federal control is evidenced by the form of contract offered them as promulgated by the Director General on October 25, 1918.

"Sect. 5. All rates, fares and charges for transportation services performed jointly by the Company and any transportation system in the possession of and operated by the Director General shall be divided fairly between the Director General and the Company. It is agreed that the arbitraries and percentages of *joint rates,* both passenger and freight, *received by the Company as of Jan. 1st, 1918,* shall not be reduced and the Company shall receive as its proportion of such *increased joint rates* amounts in the *same ratio* as its arbitraries or percentages bore to the joint rates before they were increased." The Sugar Land did not execute a contract, but the understanding and policy of the Director General is nonetheless evident. The record shows that all other short line railroads after release from federal control were allowed their old divisions. The Sugar Land Railway Company reported to the United States for income taxation its earnings, and paid taxes thereon too many years ago to revise them now. It applied to the Interstate Commerce Commission for compensation for use of and injury to its property during federal control as provided by statute, and was denied recovery because its income as revealed by these divisions was sufficient. The judgment may properly have been otherwise if the divisions are to be upset. We recognize that the Director General is not chargeable with laches, nor bound by limitation, Dupont De Nemours & Co. v. Davis, 264 U.S. 456, 44 S.Ct. 364, 68 L.Ed. 788; but while running a railroad business his conduct carries ordinary business consequences. If the question of divisions were for our decision, we should be inclined to the view that the Sugar Land Railroad Company was treated over-generously, and that the divisions agreed on September 1, 1920, were more fair. But until the original established divisions were set aside by competent authority, the Sugar Land was entitled so far as courts are concerned to do business under them.

■ A question is made as to the effect on the divisions of the increases in rates made by the Director General both before and after the Sugar Land was released from federal control. These increases were not new rates (compare as touching a general decrease by the Brimstone R. & Canal Co. v. United States, 276 U.S. 104, at pages 122, 123, 48 S.Ct. 282, 72 L.Ed. 487), but were intended to raise the operating revenues of all carriers to cover the increased cost of railroad operations, or, to state it more generally, to offset the cheapening of the dollar. The increases were equally needed by and were equally intended to aid all carriers, whether under federal control or not. Supplement to General Order 64, promulgated December 30, 1919, specifically provided as to increases: "(1). Where *joint through rates were in effect December, 1917,* but have since been *increased* or otherwise modified, the revenue shall be *apportioned on the basis effective in December, 1917,* percents to be used when divisions are so stated, otherwise *the proportion for each carrier being increased or modified in proportion to the change in the joint through rates."* A similar provision is quoted above from section 5 of the contract with released short line railroads. The evidence is that this practice was carried out at all times in the accounting. The increases were rightly prorated among the participants in a joint rate, whether effected by percentage or by the addition of an arbitrary sum to the joint rate. A right result was reached in dismissing the bill.

Judgment affirmed.