**THOMPSON et al. v. BALTIMORE & OHIO R. CO. et al. (two cases).**

**ST. LOUIS–SAN FRANCISCO RY. CO. v. BALTIMORE & OHIO R. CO. et al.**

**Nos. 13918, 13974, 14026.**

United States Court of Appeals
Eighth Circuit.

Feb. 24, 1950.

Clyde W. Fiddes, St. Louis, Mo. (Thos. T. Railey, Toll R. Ware, E. G. Nahler, John E. McCullough, and John W. Murphy, St. Louis, Mo., were with him on the briefs), for appellants.

Douglas F. Smith, Chicago, Ill. (Kenneth F. Burgess, Martin M. Lucente, Chicago, Ill., Wilton D. Chapman, F. W. Schwarz, St. Louis, Mo., Edwin H. Burgess, Baltimore, Md., H. H. McLean, New York City, Guernsey Orcutt, Philadelphia, Pa., and Sidley, Austin, Burgess & Harper, Chicago, Ill., were with him on the brief), for appellees.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

These consolidated appeals are from a decree in a suit in equity brought by the plaintiff-appellees, The Baltimore and Ohio Railroad Company, the New York Central Railroad Company, and the Pennsylvania Railroad Company, against Guy A. Thompson, Trustee, Missouri Pacific Railroad Company, Debtor, and Trustee also of its subsidiaries, New Orleans, Texas and Mexico Railway Company, The Beaumont, Sour Lake and Western Railway Company, International Great Northern Railroad Company, and The Orange and Northwestern Railroad Company; and against St. Louis Southwestern Railway Company and its corporate subsidiary St. Louis Southwestern Railway Company of Texas, sometimes called "Cotton Belt"; and against St. Louis-San Francisco Railway Company, sometimes called "Frisco", defendants and appellants.

The appellants own and operate railroad systems in Southwestern Freight Bureau Territory which, for the most part, lies west of the Mississippi river and includes Arkansas, Oklahoma and Texas and parts of New Mexico, Louisiana and Missouri. The appellees operate railroads in Central

418

Freight Association and Trunk Line Territory which with New England Territory is called Official Classification Territory. Official Territory lies generally east of the Mississippi river and north of the Ohio river.

The lines of appellants and of appellees connect at such gateway cities as St. Louis, East St. Louis and Cairo.

The controversy involves the division of revenues earned or collected between 1934 and 1946 for transporting government property from points in Central Territory westward to points in Southwestern Territory, and from points in Southwestern Territory eastward to points in Central Territory.

The controversy was before this court another time. Seeking to settle the dispute in 1943 the appellants here brought suit in the district court against the appellees for a declaratory judgment and an injunction on the basis of their claim as to what constituted a fair and legal division of the revenues jointly earned; and the appellees sought by answer, counterclaim and demand a declaratory judgment and an injunction to establish their contention as to what constituted a fair and legal division of such revenues. The court granted the relief demanded by appellees here, defendants in that suit (59 F.Supp. 21), and upon appeal to this court we reversed that part of the decree granting injunctive relief (155 F.2d 767, certiorari denied, 329 U.S. 762, 67 S.Ct. 129, 91 L.Ed. 657) on the ground that the making of joint division rates is a legislative function and is not judicial in character, citing Terminal R. R. Association et al. v. United States et al., 266 U.S. 17, 30, 45 S.Ct. 5, 69 L.Ed. 150, and Watab Paper Co. v. Northern Pac. Ry. Co., 8 Cir., 154 F.2d 436, 438. See, also, Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209. In our decision in that case we held that [155 F.2d 772] "Divisions of land grant rates to be earned in the future can be settled only by contract between the participating carriers"; and we suggested that "Division of revenues so earned in the past can be settled only by agreement or by a proper suit in equity."

During the complaint period in this case, from 1934 to 1946, charges for transportation of government property by land-grant railroads were prescribed by 10 U.S.C.A. § 1375, which section provided that "Payments" for such charges "shall not exceed 50 per centum of the full amount of compensation, computed on the basis of the tariff or lower special rates for like transportation performed for the public at large, for the transportation of property or troops of the United States * * *." The foregoing Act was repealed by Public Law 256 of the 79th Congress, and there was enacted in lieu thereof the following: "* * * the full applicable commercial rates, fares, or charges shall be paid for transportation by any common carrier * * * of any persons or property for the United States, or on its behalf, * *." 49 U.S.C.A. § 65. And § 2 of the Act provided that "* * * this Act shall take effect October 1, 1946: * * *." 49 U.S.C.A. § 65 note.

When the present suit was commenced in 1947 all of the revenues earned between 1934 and 1946 were for transportation in the past. The rights of the parties must, therefore, be determined according to principles of equity.

Not all the railroads in either Central Territory or Southwestern Territory received grants of land from the government to aid them in the construction of their lines. In Southwestern Territory the Missouri Pacific and the Frisco had land-grant mileage and the Cotton Belt had none. In Central Territory the Pennsylvania and New York Central had some land-grant mileage and the Baltimore & Ohio had none.

In order to share with the land-grant railroads, in transporting property for the government when the Acts of Congress providing for reduced charges were in effect, the appellants, the appellees, and many other railroads, pursuant to the authority of § 22 of the Interstate Commerce Act, 49 U.S.C.A. § 22, had entered into "freight land-grant equalization agreements" with the government. By the terms of these agreements the railroads undertook to transport property for the gov-

ernment at the reduced rates available to the government over land-grant railroads, "applying from point of origin to destination at time of movement." Such contracts were entered into voluntarily by the railroads and contained such conditions and limitations as the railroads filing them desired to impose. The route over the land-grant lines over which the lowest net rates are available is called the governing route, and the route over which the traffic moves under the equalizing agreements is called the competing or equalizing route.

For several years a dispute over the division of revenues arising from the joint transportation of commodities for the public from points in Central or Official Territory to points in Southwestern Territory and from the latter territory to the former existed between appellants and appellees and other railroads operating in each of these territories. That dispute was settled by a final order of the Interstate Commerce Commission on July 25, 1939.

The divisions so established are the bases on which the government determines the rates it will pay on land-grant traffic. The method employed by the government was published by the War Department in Circular No. 5-A. It reads:

"1. Percentages of deduction shown herein apply between points on individual land-grant railroads only. Where joint traffic is involved, the net rates or fares will be determined by dividing the through rates or fares between individual carriers comprising the route *according to commercial division bases and applying to the separate proportions accruing to land-grant railroads percentages published herein * * *"* (Emphasis supplied.)

Where traffic moves from point of origin to destination over two or more railroads the government settles with the delivering carrier for the entire movement and that carrier distributes the amount so received among all the participating carriers. During the complaint period in this controversy from September 12, 1934, to October 1, 1946, on government freight shipped from points in Southwestern Territory eastward to points in Central Territory, the appel-

lees, using the method applied by the government for determining the net rate to be paid, as shown by Circular No. 5-A, supra, took the amounts which the public would pay for the traffic through Central Territory and Southwestern Territory, as determined by the Interstate Commerce Commission, and after reducing each portion so determined by the land-grant deductions accruing in the respective territories remitted to the participating appellant carriers in the Southwestern Territory the amount so allocated to them. This basis of settlement is referred to in the record as the territorial, or competitive, method of division.

The effect of the territorial method of dividing joint land-grant revenues earned by participating carriers operating in different freight territories was that each carrier bore the land-grant deductions which accrued from land-grant mileage in territory traversed by it.

The appellants on westbound government traffic originating in Central Territory and consigned to points in Southwestern Territory used a different method of settlement with the participating appellee carriers. On such shipments the appellants added the land-grant deductions made by the government in each territory and apportioned the sum thereof to the respective carriers on the basis used to divide revenues earned on commercial shipments established by the Interstate Commerce Commission, and remitted the shares so determined to the participating appellee carriers. This is referred to in the record as the prorate method of division.

Since there is more land-grant mileage on the governing route in Southwestern Territory than on the governing route in Central Territory, the average effect of the prorate method of dividing land-grant revenues earned by participating carriers in Central and Southwestern freight territories required the carrier in Central Territory to bear the full amount of the land-grant deductions which accrued on land-grant mileage in Central Territory plus a portion of the land-grant deductions which

accrued on land-grant mileage in Southwestern Territory.

The primary question presented in this case is which method of dividing the land-grant revenues earned by the appellants and the appellees jointly during the complaint period, the territorial or the prorate, is fair and equitable.

In their complaint the appellees demanded an accounting and judgment against appellants for all sums of money received and retained by the appellants on all government land-grant freight traffic transported jointly by appellants and appellees from stations of appellees in Official or Central Territory to stations of appellants in Southwestern Territory from 1934 to 1946 in excess of the amount which would be allowable by applying the territorial method of division, with interest. The appellants by counterclaims demanded judgment against the appellees for all sums received and retained by the appellees for the same period on such traffic transported jointly by the parties from stations in Southwestern Territory to stations in Central Territory in excess of the amount which would be allowable by applying the prorate method of division.

The Missouri Pacific, the Cotton Belt and the Frisco, by their second counterclaims, demanded restitution of such alleged excess sums paid to appellees by compulsion of the injunctive decree of the district court in the declaratory judgment suit which was reversed by this court, which decree was in effect from February 2, 1945, until November 14, 1946, when the mandate of this court was filed in the district court.

The theory upon which the claims of the appellees and the counterclaims of the appellants is based is that the delivering railroad companies which received payment from the government and settled with the connecting carriers illegally and inequitably withheld sums of money had and received in trust for the use and benefit of the initial carriers.

The trial court made findings of fact and conclusions of law and entered an interlocutory decree sustaining the claims of the appellees and requiring the appellants to state an account as to the amount of all moneys withheld from the appellees by applying the prorate method to division of westbound government traffic during the period of complaint, instead of the territorial method. The parties agreed upon a statement of account and a formal judgment was thereupon entered against the appellants.

The appellants contend that the court erred in deciding the issues in favor of the appellees in that: 1. The prescription of divisions for past revenues is a legislative or administrative function which courts will not undertake without administrative guidance; 2. The issues upon which the court granted relief to the appellees were determined adversely to the appellees by this court in the declaratory judgment case by holdings which are the law of the case or res judicata; 3. By giving appellees' intentions and agreements controlling effect, the court exceeded its powers by imposing a contract upon appellants without their consent; 4. The evidence fails to establish that the territorial method is an equitable method of dividing the revenues in issue; 5. The territorial method of dividing joint revenues is in conflict with established principles of equity; 6. The prorate method is the just and equitable method for dividing the revenues in issue because the relative amount of services and costs are the same for government as for commercial traffic; 7. The true meaning and purpose of appellees' equalization agreements since 1934 were to open and keep open all their routes, both joint and single-line, to government traffic; 8. The prorate method of division is equitable because the deductions assumed by equalizing carriers represent the price paid to get the traffic and the benefits consist of the revenues so obtained, and the prorate method divides the deductions in proportion to the benefits (revenues) respectively gained; 9. By joining with appellants in getting government traffic appellees often got the long haul and the major share of the revenues but by the territorial method of division they propose to bear only the lesser part of the deduc-

tions; 10. Appellants' claims for restitution should be granted; and 11. Land grants to the Missouri Pacific and the Frisco do not affect the equities between the parties.

Appellants' first three contentions are without merit. They are inconsistent with our former opinion in this controversy and inconsistent with the theory upon which appellants based their counterclaims and the theory upon which appellees brought this suit. It is true that rate making and the division of joint revenues of carriers for services to be rendered in the future are legislative and not judicial functions. Thompson v. Baltimore & Ohio R. R. Co., 8 Cir., 155 F.2d 767. But this is not a rate making case and it is not intended to prescribe a division of joint revenues to be earned in the future. The parties predicate their cases upon the allegation that their adversaries have in their possession moneys had and received in trust for the parties; that they cannot agree upon a fair and equitable division of the funds in each other's possession; and they invoke the equitable powers of the court to decree an equitable division of the respective funds. It is true that a court of equity will not undertake to solve such a problem where an administrative tribunal has power to do so; but the Interstate Commerce Commission is without jurisdiction in this case, and in the absence of an agreement between the parties a court of equity alone can grant relief. The courts hesitate to assume such a responsibility, not for want of power, but because the problem is one primarily for experts with experience in such matters. Terminal R. R. Ass'n v. United States, 266 U.S. 17, 45 S.Ct. 5, 69 L.Ed. 150; Atlantic Coast Line R. Co. v. Delaware & H. R. Corp., 2 Cir., 86 F.2d 721; Morgenthau v. Sugar Land R. Co., 5 Cir., 83 F.2d 72; Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451; Atlantic Coast Line R. Co. v. Pennsylvania R. Co., D.C.Pa., 12 F.Supp. 720; Federal Power Commission v. Interstate Natural Gas Co., 336 U.S. 577, 583, 69 S.Ct. 775.

The pleadings of all the parties demonstrate that they appreciated that they were submitting their controversy to a court of equity, and their rights would be determined by the application of equitable principles. These principles are not necessarily the same as those governing the Interstate Commerce Commission when it establishes a division of rates to be earned in the future. Although all parties understood that the problem was to divide a trust fund according to the equities of the situation, the appellants, no doubt because of the origin of the fund, contended that the only way to achieve an equitable solution of the problem is to apply the formula of the prorate method of divisions of joint rates. The appellees with equal emphasis contended that the only equitable rule applicable is the formula of the territorial method of divisions. A great deal of evidence was introduced in support of the respective contentions of the parties, and the court decided the issues after carefully considering the evidence presented and admitted.

These observations are not intended to indicate that the case was not prepared and submitted with great skill and upon a correct theory of the law of the case; but rather to indicate that in deciding the contentions on appeal we should consider and decide the case upon the same theory. With this in mind we proceed to consider the vital and determinating question in the case, that is, whether equity requires the appellants to bear the deductions for all land-grant mileage in Southwestern Freight Territory and the appellees to bear the deductions for like mileage in Central Freight Territory. We have reached the conclusion that the district court correctly so held. The gist of appellants' opposing theory is that all land-grant deductions should be pooled and shared on the basis of the services rendered by the several railroads in transporting government property. This theory, if sound, must rest upon the proposition that land-grant deductions constitute a burden arbitrarily imposed by government for which none of the parties are in any degree responsible, or that none are more responsible than others. But this is not the situation. Land grants were the result of contracts between

the government and the railroad companies which received them. Southern Pacific Co. v. United States, 307 U.S. 393, 59 S.Ct. 923, 83 L.Ed. 1363; Burke v. Southern Pacific R. R. Co., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527. Grants of land to railroad companies receiving them were not gifts by the government. Burke v. Southern Pacific R. R. Co., supra.

In Louisville and Nashville Railroad Company v. United States, 267 U.S. 395, 45 S.Ct. 233, 236, 69 L.Ed. 678, the railroad company brought an action in the Court of Claims to recover the amount by which tariff-rate charges on coal transported by the railroad company for the government were reduced by land-grant deductions. The Court of Claims held that the shipments, with certain exceptions, were subject to land-grant deductions. On appeal to the Supreme Court the judgment was affirmed. The tariff rate was a dollar per ton and after land-grant deduction, the balance to be paid in money was less than a dollar per ton. "But", said the Court speaking through Mr. Justice Butler, "the land grant, made many years ago, in aid of the railroad enterprise was not a mere gift or gratuity. (Citing the Burke case, supra.) The carriers' obligation to haul property of the United States at reduced rates was a part of the consideration for which the land grant was made. Part of appellant's compensation for hauling the coal was paid in land, and the balance was paid in money. It cannot be said that the total was less than a dollar per ton." See, also, Edwards v. Cuba Railroad Company, 268 U.S. 628, 632, 45 S.Ct. 614, 69 L.Ed. 1124.

Manifestly, it seems to us, after having thus received compensation in full it would not be equitable for a land-grant railroad company to shift any part of the deductions taken by the government for transporting government property to a participating carrier operating in adjacent freight territory.

Prior to 1934 the appellants, the appellees and other joint carriers settled land-grant deductions by applying the territorial method. In that year the appellants and the appellees executed standard forms of equal-ization agreements used by the Federal Government. Appellants argue that by the express terms of these agreements all the parties to this litigation "equalized all deductions available over the land-grant route from origin to destination of each shipment." The pertinent clauses of these agreements read:

"1. The ............ Railroad Company hereinafter called this carrier, hereby agrees, subject to the conditions and exceptions stated below, to accept for the transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-grant roads, the lowest net rates lawfully available, as derived through deductions account of land-grant distance from lawful rates filed with the Interstate Commerce Commission or the various State Commissions *applying from point of origin to destination at time of movement.*

"2. Conditions—

"(a) *On traffic destined to and/or received from points on lines of other carriers this agreement will apply in connection with such carriers as have an agreement of the form stated in paragraph 1 above on file* with the Quartermaster General, War Department, Washington, D. C., except as otherwise provided under the heading of Exceptions in paragraph 3 below.

"(b) On traffic destined to and/or received from points on lines of other carriers this agreement is subject also to the exceptions in the agreements of each individual carrier forming part of the through route of movement, on file with the Quartermaster General, War Department, Washington, D. C., except as may be otherwise provided under the heading of Exceptions in paragraph 3 below." (Emphasis supplied.)

In construing these contracts it should be observed that they are contracts between individual railroad companies and the government, and not contracts between railroad companies. They operate specifically in the field where railroads without land-

grant mileage are in competition with roads having such mileage. The land-grant road is the governing route and its competitors which enter into such contracts are called the equalizing or competitive routes.

Emphasis is placed upon the provisions of Conditions 2(a) and 2(b) of the agreement. These conditions were in the standard agreements of 1922, also, and during the period from 1922 to 1934 appellants applied the territorial method to the division on through traffic.

The arguments in reference to the effect of the 1934 equalization agreements are lengthy and cover the history of land-grant agreements and the practice of the parties to this litigation as well as the construction placed upon them by all the parties to this litigation and by the government. The evidence is fairly reviewed by the trial court (80 F.Supp. 570), and we agree with its conclusions stated on pages 583 and 585, of 80 F.Supp. thereof, where it is said:

"The language in the agreement—'from point of origin to destination at time of movement'—was conditioned as to 'traffic destined to and/or received from points on lines of other carriers,' that such 'other' carriers had a like agreement, which would obligate such carrier to absorb the land grant it was competitive to. When this is read in light of the history of prior settlement of land grant deductions as between connecting carriers, that it had always been on a territorial basis, it cannot be held to be subject to the construction, authorizing a change to a pro-rate method of settlement as now claimed by defendants.

\* \* \* \* \* \*

"We conclude the evidence supports the position of plaintiffs that their 1934 agreements did not obligate them to assume any land grant equalization deductions outside 'C. F. A.' Territory and defendants' action in withholding funds from plaintiffs due them on the territorial basis of settlement of land grant deductions was without authority or justification in law or equity."

Since the parties to this case could not agree upon a division of the revenues involved in the controversy, and since they joined in invoking the jurisdiction of the court as a court of equity, we, after a painstaking review of the record and of the authorities cited in the briefs, are satisfied that the trial court reached an equitable and correct result. It would be useless to extend this opinion, therefore, by reviewing the evidence, which has already been well done by the trial court, and the authorities further than we have already done. The evidence of government and railroad officials is preponderately to the effect that sections 1 and 2, supra, of the equalizing agreements have since their inception been considered applicable to railroads competing within a freight district only and not to connecting railroads operating in different although contiguous freight districts. Had the government paid to each participating carrier its share of the charges for carrying each shipment on the same principle that it found the total instead of paying the delivering carrier the total charges to be distributed, there could have been no ground of complaint by any of the parties in view of the decision of the Supreme Court in Louisville and Nashville Railroad Company v. United States, supra.

The conclusion we have reached above disposes of the counterclaims of the appellants Missouri Pacific Railroad Company and the Cotton Belt for restitution of the payments made to appellees under compulsion of the injunction in the declaratory judgment case, and, also, of the appeal of the Frisco from the overruling of its motion for restitution.

It has been suggested further that it is not equitable to require the Cotton Belt to share the burden of land-grant deductions under the territorial method for the reason that it has no land-grant mileage on its lines. Another situation having the same element of inequality arises in cases of shipments over two lines of different land-grant mileage. These burdens, however, result from their equalization contracts with the government, and they are not the result of anything which occurred in Central Territory or because of the appellees.

The judgments appealed from are affirmed.