**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.
March 16, 1972.

Richard R. Bongartz, Paul R. Duke, Philadelphia, Pa., for Trustees of Penn Central Transportation Co.

Royall, Koegel & Wells, by William R. Glendon, William J. O'Brien and George W. Brandt, Jr., New York City and Clark, Ladner, Fortenbaugh & Young, by William Charles Hogg, Jr., Samuel B. Fortenbaugh, Jr., and Edward C. Toole, Philadelphia, Pa., for Committee of Interline Carriers.

Reedy & McDonnell, by Thomas J. McDonnell, Chicago, Ill., for Indiana Harbor Belt R. R.

Obermayer, Rebmann, Maxwell & Hippel, by Alan C. Kauffman, Philadelphia, Pa., for Louisville & Nashville R. R., Illinois Cent. R. R., Chicago & Illinois R. R. and Waterloo R. R.

## OPINION AND ORDER NO. 613

FULLAM, District Judge.

The Trustees have petitioned for an order directing certain rail carriers (interline railroads) to pay interline balances owing to the Debtor. The Trustees contend that these interline railroads have violated paragraph 10 of Order No. 1 in these proceedings, which provides in part:

> "All persons, firms and corporations . . . holding for the account of the Debtor deposit balances or credits be and each of them hereby are restrained and enjoined . . . from off-setting the same, or any thereof, against any obligation of the Debtor, until further order of this Court."

There is no substantial dispute that the interline railroads and the Debtor have claims against each other, nor is there any substantial dispute as to the amount of these claims. The issues to be resolved herein, among others, are whether the claims of the interline railroads extinguish the Debtor's claims; assuming the Debtor's claims are not extinguished, whether the interline railroads are entitled to resort to the remedy of set-off against such claims; whether the interline railroads are entitled to an equitable lien on the estate of the Debtor for the amount of any claims remaining unpaid; and whether Order No. 9 in these proceedings requires additional payments to be made by the Debtor to the interline railroads.

### I. The Factual Background

#### A. The System of Interline Accounts

The nation's railroads function in many ways as a single system. For ex-

ample, a shipper or receiver pays one railroad for services of carriage for the entire shipment, although the shipment may travel over many different railroads; a railroad car may travel over the lines of many different railroads, and be used by each of them, before it again returns to the possession of the owning railroad; and a shipper whose freight may have been damaged in shipment by one of several carriers may apply to any of them for payment of his claim. The railroads have created a system of accounting and periodic settlement of accounts to facilitate this manner of operation. The accounting for various types of rail service rendered to the public or to other railroads results in "interline accounts," and the striking of balances between the railroads with respect to these interline accounts results in "interline balances." Each of the accounts is settled separately; there is no netting of the balances in different accounts.[1]

The present petition involves six interline accounts: Freight, Passenger, Per Diem, Switching, Overcharge and Car Repairs. In addition, the respondents make reference to two other accounts: the Loss and Damage Account and an account encompassing "Miscellaneous Bills" for services, facilities and supplies furnished by one railroad to another. These accounts are described below.

### Freight

Where a freight shipment moves over more than one railroad, each road is entitled to be paid for the part of the carriage it performed. The destination carrier (who either collects from the consignee or debits the originating carrier if the shipment is prepaid) has the responsibility of computing from the waybill issued by the originating carrier the amounts due to the originating carrier and to the intermediate carriers. Rule 110A. These computations are made for each waybill reported by the destination carrier's agent in a particular month regardless of whether the freight charges have actually been paid.

The results of these computations ("abstracts" and "recapitulations of abstracts") must be sent to the other carriers by the 18th of the month following the month in which the waybill was issued. Rule 145. The Rule contemplates that at least the net figures should reach the other carriers by the 20th of that month. Rule 146. [The calculation of the account also may include corrections from freight accounts rendered as many as 36 months earlier. Rule 170.] After accounts are rendered, net balances are struck between the carriers. These balances are subject to immediate sight draft. Rule 149.

### Passenger

Interline passenger accounts are prepared by each ticket-selling carrier. The accounts so prepared are exchanged by mail on or before the last day of the month after the month in which the sales were reported. Rule 1. Here, too, settlement of the net interline account balances is subject to immediate sight draft. Rule 9.

### Overcharge

The Overcharge Account reflects claims made by shippers for refunds in situations where too much was charged. A shipper may make such a claim against any carrier participating in the carriage. That carrier investigates the claim and pays it if it finds it valid. The paying carrier then charges the responsible carriers under the rule. These accounts are to be stated by the 10th of the month following the one in which the claim was settled; and settled by draft on or after the 25th of the same month on a gross basis. Rule 91A. It is the Debtor's policy to issue drafts against other carriers

---

1. This system of accounts is established and governed by rules promulgated by the Association of American Railroads ("AAR"), of which the railroads in this proceeding are members. The "Rules" referred to in this Opinion governing each account and the publications in which they are found are listed in the Appendix.

only for amounts it has actually paid to shippers.

### Loss and Damage

The same principles governing the Overcharge Account apply to the stating and settling of the Loss and Damage Account, Rule 152, except that the paying carrier must have actually paid before charges can be stated against another carrier. Rule 150.

### Car Repair

The National Safety Appliance Act mandates that each carrier perform necessary repairs on cars found to be defective. 45 U.S.C.A. § 13 (Supp. 1972). Bills for car repairs are required to be rendered no later than the last day of the month following the month in which the repairs were made. Each month's bill may include charges for car repairs made within the preceding 12 months. Settlement is made on a gross basis by draft on or after the 15th of the next month. Rule 23.

### Per Diem

The Per Diem Account reflects the daily rental charge for the use of railroad cars belonging to another carrier. Reports of per diem due must be forwarded to the owning carrier by the 10th day of the second month following the month in which the per diem accrued. Rules 5, 6. The net balances of these accounts are subject to draft immediately thereafter.

### Switching

While the Switching Accounts are not governed by any mandatory rules, Freight Recommendatory Rule 408 sets forth the general intent of the industry concerning their settlement. It provides that the Switching Accounts that can be settled on a carrier-to-carrier basis (many apparently cannot) are to be stated by the 18th of the month following the month for which settlement is being made. Settlement is made by draft for the net balance due, not later than the 25th day of that month.

### Miscellaneous Bills

In addition to the transactions encompassed by the preceding accounts, interline railroads render bills to each other for such things as the joint operation of passenger terminals and freight yards, refrigeration services and the destruction of one railroad's equipment on another carrier's lines. These miscellaneous bills are settled by check. Disbursements Mandatory Rule 3 provides for the form of such bills; however, there are no general rules governing the time in which they should be rendered or paid.

### B. Proceedings Leading to the Present Petition

Paragraph 3 of Order No. 1 in these proceedings, entered June 21, 1970, the date Debtor filed for reorganization, provides in part:

"The Debtor is authorized in its discretion, from time to time until further order of this Court, out of funds now in its possession or hereafter coming into its hands, to pay . . .

"B. All other current expenses and costs hereafter necessarily incurred in operating, maintaining and preserving its railroad and other properties, collecting the revenues, and conducting the business of the Debtor . . . including . . . all wages . . . all interline accounts and balances owing by the Debtor . . . and all accounts for services, materials and supplies rendered or furnished to the Debtor."

The Debtor declined to pay any interline balances on or after June 21, 1970. On June 24, 1970, Burlington Northern, Inc. moved to amend Order No. 1 to require the Debtor to pay interline balances. A hearing was held on July 1, 1970, on that motion. At the conclusion of the hearing, the Court invited counsel to submit a form of order which would make mandatory the payment of post-petition

interline balances stated from and after that date. That form of order became Order No. 9. The Court expressly left open the question of the status of the interline balances not required to be paid by that Order. (Tr. 69.)

## II. *The Merits*

The Trustees assert that the interline railroads have not paid amounts owing the Debtor under the applicable AAR Rules, for the six interline accounts mentioned above. As of the date of the hearing, November 29, 1971, it was undisputed that, apart from a few comparatively minor items in dispute, these interline balances amounted to approximately $3.4 million. (Tr. 4064–65, 4068, 4077.) The Trustees contend that the interline railroads are not entitled to set off their claims against this amount, and that the interline railroads should be compelled to pay the balances owing to the Debtor.

The interline railroads [2] make four responses to the Trustees' petition:

Their first defense is in the nature of a counterclaim which, if sustained, would extinguish the claims of the Trustees. They assert that the Debtor owes them approximately $13.5 million and that the part of this amount attributable to the freight and passenger accounts must be considered a trust fund and that they are entitled to be paid that amount less what they owe the Debtor. While they do not contend that the other part of the $13.5 million which is attributable to the other interline accounts is a trust fund, they do contend that equitable principles entitle them to payment of this amount.

Second, the interline railroads contend that they are entitled to resort to the remedy of set-off against the claims of the Debtor. The Louisville and Nashville Railroad Company and the railroads joining with it expressly challenge the jurisdiction of this Court to enjoin set-offs against the Debtor's claims.

Third, the interline railroads contend that to the extent that their claims remain unpaid, they are entitled to an equitable lien on the estate of the Debtor.

Fourth, they counterclaim for amounts which they contend the Debtor is required to pay pursuant to Order No. 9 in these proceedings.

## A. *The Right of the Interline Railroads to Payment of their Claims*

The interline railroads' first contention is that the amounts owed by the Debtor are trust funds. It is argued that pursuant to the Rules governing the freight and passenger accounts, the Debtor has collected money which belongs to the interline railroads and that these monies are "trust funds" which should be paid over to the interline railroads. Moreover, it is argued that because statutes and ICC regulations require the interline railroads to deal with the Debtor, the interline railroads' claims should be accorded a priority higher than the trade creditor who could choose whether or not to deal with the Debtor.

With respect to the trust fund argument, the interline railroads have cited various cases in support of the proposition that interline balances, representing the portion of monies collected by the Debtor for freight and passenger service performed by the interline railroads, are trust funds. However, two of the cases cited, Atlantic Coast Line R. Co. v. Pennsylvania R. Co., 12 F.Supp. 720 (E.D.Pa. 1935); Thompson v. Baltimore and O. R. Co., 80 F.Supp. 570 (E.D.Mo.1948), aff'd 180 F.2d 416 (8th Cir. 1950), hold only that where several railroads are involved in the carriage of a shipment and one of them, not in reorganization, has received payment for the entire carriage,

---

2. The term "interline railroads" as used in this Opinion refers collectively to the respondents to the Trustees' petition. The respondents have joined together in three groups: The Committee of Interline Railroads (the largest group); the Louisville and Nashville Railroad Company, and the three railroads joining with it; and the Indiana Harbor Belt Railroad. For the most part, the arguments made by one group are applicable to the others. Therefore, it will not generally be necessary to consider which group makes a particular argument.

the others may maintain an action in equity for their fair share. The exact nature of the revenues, *i. e.*, whether or not the revenues were "trust funds," was not an issue in either case. And the term was not used by either court as a basis of its holding but rather simply part of its analysis of the case as an action in equity. Atlantic Coast Line R. Co. v. Pennsylvania R. Co., *supra*, 12 F.Supp. at 722–723; Thompson v. Baltimore and O. R. Co., 80 F.Supp. at 572, 575; 180 F.2d at 421.

In the third case relied on by the interline railroads, Southern Ry. Co. v. United States, 306 F.2d 119 (5th Cir. 1962), the court based its statement that interline freight balances could acquire a " 'trust' character" "on a line of cases which hold [that] funds [which] have been wrongfully applied by the Court appointee during the pendency of a receivership, bankruptcy, or reorganization," may become trust funds. *Id.* at 124–125, n. 5. This is obviously not the situation which is presented in this proceeding and, in any event, since the court in *Southern* ultimately determined that a priority should not be accorded to the interline balances under the trust fund theory, the court's statement can hardly be regarded as the holding of the case.

The interline railroads also assert that because they are compelled to deal with the Debtor, some special equities should arise in their favor. The interline railroads appear to assert in their memorandum of law that they were legally compelled to deal with the Debtor so as to allow interline balances to become owing to them by the Debtor. (Pp. 27–29, 38.)

While it is true that the interline railroads are required, for example, to accept from each other and to transport freight and passenger traffic and to correct unsafe conditions found on each other's cars, there is no requirement that interline railroads extend credit to each other. In fact, in proceedings leading to the entry of Order No. 9, the interline railroads detailed measures that could be taken to put a railroad, that could not be counted on to make its interline balance settlements, on a "cash" basis. *E.g.*, Tr. 23–26; Memorandum of Burlington Northern, Inc. (Document No. 18) at 5. Moreover, it is apparent that the interline railroads' description of such measures did not exhaust the list of measures that could be used to put a railroad on a cash payment rather than a credit basis. *See* Southern Ry. Co. v. Flournoy, 301 F.2d 847, 855–856 (4th Cir. 1962) (security deposit; creditor railroads' control of car movements).

■ Therefore, the interline railroads having offered no persuasive authority to the contrary, this Court is bound to follow In re Central Railroad of New Jersey, 273 F.Supp. 282 (D.N.J.1967). In that case, the arguments made here were presented, and the issues thus raised were resolved squarely against the interline railroads. The Third Circuit affirmed that decision *per curiam*, 392 F.2d 589 (3d Cir. 1969), expressly adopting the district court's reasoning. Accordingly, I have concluded that the interline railroads are not presently entitled to payment of the pre-petition interline balances owed by the Debtor.

### B. Control of the Exercise of the Right of Set-Off

The interline railroads next assert that they should be accorded the right to offset their claims against the Debtor against the amounts they owe.

■ Having determined that equitable principles do not extinguish Debtor's choses in action running against the interline railroads, it is necessary to determine whether this Court can and should enjoin the exercise of the remedy of set-off against those choses in action. The issue of this Court's jurisdiction to enjoin set-offs against choses in action held by the Debtor is no longer in question. In Matter of Penn Central Transportation Company, Debtor, First Wisconsin National Bank, et al., 453 F.2d 520 (3d Cir. 1971); *see* In Matter of Penn Central Transportation Company, Debtor, Re: Application of the Trustees for an

Order Directing Certain Shippers and Others to Pay Amounts Owing to the Debtor, Opinion and Order No. 571, 339 F.Supp. 603 (E.D.Pa.1972).

Whether set-offs should be enjoined presents a more substantial and more difficult issue. Many of the considerations discussed in the "shippers" case, above, are relevant here. The claims of the interline railroads arose out of transactions which were a vital part of the Debtor's day-to-day business. Such claims would probably fall within the so-called "six-months' rule" which has been held applicable in § 77 proceedings, and would likely be entitled to a high priority. *E.g.*, 5 Collier on Bankruptcy, ¶77.21 nn. 27–29 (1970).

■ But, just as in the "shippers" case, several factors persuade me that set-offs should be prohibited at this time. First, to permit set-offs could discriminate against the many other suppliers of services and equipment to the Debtor. At the hearing on July 1, it was estimated that pre-petition claims by these suppliers would aggregate over $200 million. In view of the substantial uncertainty that the interline railroads will be able to establish a distinction between their claims and the claims of the Debtor's trade creditors, it would not be appropriate to permit the interline railroads to resolve the question favorably to themselves through the self-help remedy of set-off prior to determination of the question in the proof of claims program.

Second, the Debtor's cash position must be considered. *See* the "shippers" Opinion, *supra* at 9. The Debtor is still unable to pay all of the costs of present operations, *e. g.*, taxes and leased-line rentals.

### C. *The Claim for an Equitable Lien*

The interline railroads' third contention is that they are entitled to an equitable lien on the Debtor's estate to the extent that their claims remain unpaid. The interline railroads argue, in essence, that even if they are not entitled to payment now on the basis of the various equitable theories discussed previously, at the least they should be entitled to an equitable lien. If this contention were sustained, it would be equivalent to the finding that the interline railroads are entitled to the payment of their claims from the Debtor's estate immediately after administration expenses, ahead of all other creditors.

The arguments that equitable principles entitle the interline railroads to immediate payment of their claims were rejected previously. But, whether an application of these principles should entitle the interline railroads to a priority, and what that priority might be, presents a different question. It appears, however, for a number of reasons, that decision of this question should await the classification of the interline railroads' claims in the proof of claims program. First, the Debtor's other creditors who may be affected by a decision of this question have not had an opportunity to express themselves with respect to it. Allowing an opportunity for such expression would be particularly important here where the interline railroads' entitlement to an equitable lien is open to serious question. Indeed, neither of the two cases cited by the interline railroads as directly supporting their contention, In re Tennessee Cent. Ry. Co., 316 F. Supp. 1103 (M.D.Tenn.1970); Southern Ry. Co. v. Flournoy, 301 F.2d 847 (4th Cir. 1962), distinguished between claims of interline railroads and claims by trade creditors. Both cases dealt with the application of the six months' rule to claims of creditors, including interline railroads. Given the uncertainty of the proposition which the interline railroads advance, there can be no justification at this time for placing their claims ahead of the claims of the Debtor's trade creditors.

■ Second, whatever may be the situation in the reorganization of a smaller railroad, Southern Ry. Co. v. Flournoy, *supra*, 301 F.2d at 850, the classification of claims in this reorganization presents complex and difficult issues. Questions of this importance should be adjudicated in the context of the general program for determining the rights of creditors. For

the two foregoing reasons, therefore, the application of the interline railroads for the imposition of an equitable lien on the estate of the Debtor will be denied without prejudice.

### D. *The Counterclaim for Payment Under Order No. 9*

The interline railroads' counterclaim is based on the contention that the Trustees have not paid all of the accounts which they were directed by Order No. 9 to pay. The pertinent language of the order requires payment of ". . . interline account and balances *first stated or presented and due to be stated or presented for settlement* on or after [July 1, 1970]." It is argued that this language requires payment of certain additional Car Repair, Passenger, and Miscellaneous Accounts which were or should have been billed before bankruptcy, but as to which sightdrafts were not due to be presented until after the date of Order No. 9.

■ This interpretation equates presentation of a draft and statement of the account; more importantly, it overlooks the word "first" in the Order. Accounts which were either stated or presented prior to the date of Order No. 9 were not required by that Order to be paid, and thus respondent's contentions with respect to the Car Repair and Passenger accounts are clearly without merit.

The Miscellaneous Bill Account presents different issues. The interline railroads assert that such bills aggregating approximately $1.9 million were, in normal course, first presented to the Debtor after the crucial date, and this fact is not substantially disputed. The question is whether this account was intended to be included in Order No. 9.

The Trustees argue that Order No. 9 relates only to accounts which are stated and settled in accordance with AAR Rules, and that the Rules do not govern settlement of Miscellaneous Bills, but only their form. Admittedly, however, the language of Order No. 9 can be more broadly interpreted.

It must be emphasized that the wording of Order No. 9 was drafted by counsel for the parties, by agreement. The Court was not called upon to rule, and did not consider, the specific application of the Order to the Miscellaneous Account. It now appears that the parties either did not consider this question, or at any rate are presently unable to establish that there was agreement on the question. Accordingly, a present decision as to the correct interpretation of Order No. 9 should be based upon the same considerations as if the underlying question were now presented to the Court for decision.

■ As discussed above, it can be persuasively argued that all of the claims of interline railroads should be treated no differently from the claims of trade creditors. Of all of the interline claims, the Miscellaneous Bills most nearly resemble the claims of ordinary trade creditors. I have therefore concluded that Order No. 9 should not be construed as requiring payment of the Miscellaneous Account claims which are the subject of respondents' counterclaims.

### E. *Remedy*

To summarize, I have concluded that the interline railroads are not now entitled to payment of their claims or to the declaration of an equitable lien or a priority in respect of them; that the counterclaims should be rejected; and that the interline railroads should be enjoined for the present from setting off these claims against the claims of the Debtor.

Pursuant to the practice followed in the "shippers" case, *supra*, an order in general terms will be entered at this time, on the assumption that implementation can be accomplished by further specific directions if necessary.

### APPENDIX

#### Source of Rules Governing Interline Accounts

Freight Account: Freight Mandatory Rules in Railway Accounting Rules published by the Accounting Divi-

sion, Association of American Railroads (effective Oct. 1, 1969) and its Supplement (effective Sept. 1, 1970) [hereinafter "Railway Accounting Rules"].

Passenger Account: Passenger Mandatory Rules in Railway Accounting Rules.

Overcharge Account: Overcharge Mandatory Rules in Railway Accounting Rules.

Loss and Damage Account: Freight Claim Rules published by Freight Claim Division, AAR (1970).

Car Repairs Account: Disbursements Mandatory Rules in Railway Accounting Rules; Code of Car Service Rules, Circular No. OT–10–B (effective Jan. 1, 1968), published by Operating-Transportation Division, AAR; Code of Rules for the Interchange of Traffic (effective Jan. 1, 1969), published by Mechanical Division, AAR and its Supplements Nos. 1 and 2.

Per Diem Account: Disbursements Mandatory Rules in Railway Accounting Rules; Code of Per Diem Rules Circular No. OT–10–B (effective Jan. 1, 1968), published by Operating-Transportation Division, AAR.

Switching Account: Freight Recommendatory Rules in Railway Accounting Rules.

Miscellaneous Bills: Disbursements Mandatory Rules in Railway Accounting Rules.

### ORDER NO. 613

And now, this 16th day of March, 1972, it is ordered that:

1. The Petition of the Trustees for Order Directing Rail Carriers to Pay Interline Balances is GRANTED IN PART, and the respondents in this proceeding are enjoined, until further order of this Court, from setting off or attempting to set off against obligations due and owing to the Debtor on account of interline balances due in accordance with the Accounting Rules of the Association of American Railroads, any claim or claims which they may have against the Debtor for interline balances due from the Debtor in June or July, 1970, in accordance with said Accounting Rules, or other claims which arose prior to June 21, 1970, but any such claim or claims may be filed and proved in accordance with Order No. 164 in these proceedings. This Order shall be deemed to be without prejudice to the right of any such respondent to claim such priority as may be proper.

2. Order No. 9 in these proceedings does not require payment by the estate of the Debtor of bills from interline railroads for certain services, supplies and facilities referred to in the foregoing Opinion as "Miscellaneous Bills" and referred to in the "Memorandum in Support of Answer, Defenses and Counterclaims of the Committee of Interline Railroads . . ." as "Schedule A Accounts."