**In the Matter of READING COMPANY, Debtor.**

**Petition of UNITED STATES of America For an ORDER DIRECTING the TRUSTEES TO CEASE MAKING INTERLINE PAYMENTS.**

**No. 880.**

United States District Court, E. D. Pennsylvania.

Aug. 4, 1975.

Howard H. Lewis, Philadelphia, Pa., for Reading Company.

James F. Dausch, Dept. of Justice, Washington, D. C., for United States.

W. Charles Hogg, Jr., Philadelphia, Pa., William R. Glendon, New York City, for Committee of Interline Railroads.

Robert L. Pratter, Philadelphia, Pa., for Lehigh Valley Railroad Co.

## OPINION AND ORDER NO. 880

DITTER, District Judge.

The Court of Appeals for this Circuit decided almost two years ago that freight balances collected by one rail carrier for services performed by another [1] are held in trust and must be paid to their rightful owners. See *In re Penn Central Transportation Company,*

---

1. My colleague Judge Fullam has succinctly explicated the system of accounts of interline railroads as follows:

The nation's railroads function in many ways as a single system. For example, a shipper or receiver pays one railroad for services of carriage for the entire shipment, although the shipment may travel over many different railroads; a railroad car may travel over the lines of many different railroads, and be used by each of them, before it again returns to the possession of the owning railroad; and a shipper whose freight may have been damaged in shipment by one of several carriers may apply to any of them for payment of his claim. The railroads have created a system of accounting and

periodic settlement of accounts to facilitate this manner of operation. The accounting for various types of rail service rendered to the public or to other railroads results in "interline accounts," and the striking of balances between the railroads with respect to these interline accounts results in "interline balances." Each of the accounts is settled separately; there is no netting of the balances in different accounts. (footnote omitted.)

*In re Penn Central Transportation Company,* 340 F.Supp. 857, 858–59 (E.D.Pa.1972), affirmed in part and reversed in part, 486 F. 2d 519, 521 (3d Cir. 1973), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974).

486 F.2d 519, 524 (3d Cir. 1973), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). Following that decision, Reading personnel and the Committee of Interline Railroads, representing other carriers, met to work out an acceptable schedule for payment of interline trust funds amounting to $3,722,894.84. As a result of these negotiations a settlement was reached, the terms of which I approved on December 4, 1974, in Order No. 730 of this proceeding.

On May 9, 1975, in an unpublished *per curiam* opinion, the Court of Appeals vacated an order of the Central Railroad of New Jersey (CNJ) reorganization court denying the Government's application for an order restraining the CNJ trustee from paying certain interline balances. The Government had contended that such payments should not be made unless the trustee demonstrated that they would not jeopardize the continuation of CNJ's rail service. See *In re Central Railroad Company of New Jersey,* 515 F.2d 506 (3d Cir., filed May 9, 1975). In remanding the matter to the District Court, the Court of Appeals stated:

> The district court should have provided that it would reconsider, upon an appropriate record, at regular intervals the propriety of CNJ's paying $250,000. per month in discharge of the above interline balances, and such reconsideration should take place at least quarterly. At the time it reconsiders the monthly payments which can be made by the trustee, consistent with the obligation to continue operation's of the railroad as part of the nation's national transportation system, the court should make findings of fact consistent with Rule 52 of the Federal Rules of Civil Procedure and give reasons for its action based on such findings, so that appellate review will be facilitated. The district court's failure to make such findings and to state its reasoning is among the causes for our vacating Order No. 705.

> Factors that should be considered by the district court in determining the amount, if any, that should be paid on account of the interline balances still owing include these:

> (A) projected income and expense estimates and cash flow for the month in which any payment is planned to be made and for future months, insofar as such estimates can be made;

> (B) the effect which the proposed payments on account of the above-described interline balances will have on continued operation of CNJ in light of a plan of reorganization under the R.R.R.A., as well as on continued operation of B & O and C & O;

> (C) the risk of CNJ's being placed on a prepay basis by B & O and C & O if it fails to pay these deferred balances and the hardship to CNJ of being placed on a prepay basis;

> (D) the position taken by the Federal Railroad Administrator, the Secretary of Transportation, and the State of New Jersey concerning the proposed payment, in view of their regular payments to CNJ;

> (E) whether payment of these deferred balances from funds paid to CNJ pursuant to Section 213 of the R.R.R.A. is consistent with the purposes of that section; and

> (F) the extent to which the State of New Jersey is paying for the losses incurred in operating passenger service for the benefit of New Jersey residents and businesses. [footnote omitted].

Id. at 4–6.

▪ Subsequent to the CNJ decision, the Government filed in these proceedings a petition for an order directing the trustees to cease making installment payments on account of deferred interlines.[2] The trustees and the Com-

---

2. The Government's petition was prompted no doubt by the application of the trustees for authority to obtain funds for maintenance and improvements under the provi-

mittee of Interline Railroads filed timely answers and memoranda in opposition to the Government's petition. Following a hearing on July 14, 1975, I entered an order directing the trustees, pending this decision, not to make the payment due in July, 1975.

Although I entertain substantial doubts concerning the precedential value of the unpublished CNJ decision,[3] in the interest of facilitating the appellate review which almost inevitably will follow this opinion, and addressing, as closely as possible, the criteria enumerated in the CNJ case, I make the following:

## FINDINGS OF FACT

1. By the terms of an agreement between the trustees and the Committee of Interline Railroads, effective December 4, 1974, debtor is to use its best efforts to amortize its interline obligations at the rate of $275,000. per month after an initial payment of $300,000.

2. The trustees and their representatives construe the provision that deferred funds should be paid on a "best efforts" basis to mean that such payments are to be made if at all possible until the Reading ceases operations. N. T. 108.[4]

3. The trustees have forecast a cash balance of $1.1 million without Govern-

ment assistance through July, 1975. Exhibit 4.

4. During the period July–September, 1975, it is contemplated that debtor will receive a maximum of approximately $1.1 million in federal financial assistance for Reading's maintenance program under Section 215 of the Regional Rail Reorganization Act of 1973 (RRRA), as amended, 45 U.S.C. § 725, pursuant to agreements between the trustees and the Federal Railroad Administration (FRA) and United States Railway Association (USRA). N.T. 8–10.

5. During the period of July–September, 1975, the debtor will receive federal emergency assistance under Section 213 of the RRRA in a now indeterminate amount in excess of $825,000., the amount owing in interline installments during that period.

6. Although debtor projects total receipts in excess of $20 million for the three-month period July–September, 1975, absent financial assistance from the federal Government, the trustees have forecast a cash shortage of $5.8 million at the end of that time.[5] Exhibit 4.

7. Whether the proposed payments to the Interline Committee are made or dis-

sions of Section 215 of the Regional Rail Reorganization Act of 1973 (RRRA), as amended, 45 U.S.C. § 725, authority which I granted in Order No. 861 of these proceedings. Subsequent to the hearing on the Government's present petition, the trustees additionally sought authority, which I granted in Order No. 868, to obtain emergency assistance under Section 213 of the RRRA. The Committee of Interline Railroads argued vigorously that since the Reading has to date received no federal funds, see Findings of Fact Nos. 3 and 16 *infra*, the Government lacks standing to bring the instant petition. Inasmuch as debtor will, however, obtain substantial sums of both Section 213 and Section 215 moneys within the next three months, see Findings of Fact Nos. 4 and 5 *infra*, I conclude that the Government's interest is sufficient, for purposes of this petition, to confer standing. Cf. *Contractors Association of Eastern Penn-*

*sylvania v. Secretary of Labor*, 442 F.2d 159 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

3. Under the internal operating procedure of the Court of Appeals, such opinions are not normally deemed of precedential value. See Internal Operating Procedure, United States Court of Appeals for the Third Circuit (effective January 1, 1974) 9.

4. Unless stated to the contrary, all citations are to the notes of testimony of the hearing of July 14, 1975, in this proceeding.

5. This revised forecast is a marked improvement over the trustees' original prediction of a $7,200,000 cash shortfall. The parties do not agree as to the net effect that a five percent freight increase, effective July 1, 1975, will have on debtor's receipts. However, for the overall purposes of this decision, the differences in their estimates are unimportant.

continued will not appreciably affect Reading's ability to continue operations.[6]

8. Discontinuation of interline payments may well, however, have an impact upon the operation of another railroad, the Delaware & Hudson Railway Company.

9. The Delaware & Hudson, the only solvent railroad in the heavily populated areas of the Northeast, is owed some $85,000. in interline funds by the Reading. Presently the Delaware & Hudson is in an extremely serious financial position, having experienced a loss of over $1 million for the first five months of this year. The substantial diminution of cash needed for its operation will to a degree be alleviated if Reading's interline payments are made. Affidavit of Robert E. Sullivan; N.T. 140–43.

10. The Lehigh Valley, which like the Reading is in reorganization, has an annual deficit of over $12 million and is owed trust funds by debtor in excess of $40,000. The interline funds, which under the holding in *In re Penn Central Transportation Company, supra,* rightfully belong to Lehigh Valley, will, to the extent debtor pays them to Lehigh Valley, diminish accordingly the amount of government funds which that line must seek. Affidavit of James W. McConnell; N.T. 146.

11. Although there is little likelihood of Reading's being placed on a prepay basis by other railroads if it fails to meet its payment to the trust beneficiaries,[7] there is a possibility that shippers and connecting lines will reroute or otherwise divert traffic over other lines resulting in less traffic and consequently less revenue.

12. The Reading has to date received no Section 213 or 215 funds from the FRA. Since it is likely to do so in the near future, however, see Findings Nos.

4 and 5, *supra,* the views of the federal railroad administrator and the Department of Transportation are relevant. See note 2, *supra.*

13. The FRA and the Department of Transportation have taken the position that a Government cash shortage in the administration of Section 213 and 215 funds may occur during February–March, 1976, but probably not before. Moreover, the Government seeks to conserve cash in order to amass a "contingency fund". N.T. 16–17; 62. The Government has, however, failed to establish that the cessation of operations of any RRRA railroad would result if payments are continued during the relevant three-month period of July through September, 1975, or that such a "contingency fund" is essential for the continued administration of the RRRA Grant and Loan Program.

14. The Government has failed to demonstrate that satisfaction of interline trust obligations is inconsistent with the purposes of Section 213 or any other provision of the RRRA. The Congressional declaration of policy set forth in Section 101(a)(3) recognizes the necessity to maintain adequate and efficient rail service within the region as well as throughout the nation. Interline payments are an essential part of this system. The act is, moreover, totally devoid of any provision expressly foreclosing trust payments or precluding debtor from continuing them. To the contrary, since hearings in support of the appropriations for sections 213 and 215 funds were held after the decision in *In re Penn Central Transportation Company, supra,* it is logical to assume that Congress gave implicit recognition and approval to the payment of interline obligations by railroads in reorganization even though they might be receiving government grants.

6. See *In re Lehigh Valley Railroad Company,* 508 F.2d 332, 338–40 (3d Cir. 1975).

7. In order to place debtor on prepay, any interline railroad would first have to file a prepay tariff with the Interstate Commerce

Commission, which could suspend or cancel the tariff if not sustained with sufficient proof by the interline. Exhibits 1–3.

Were debtor placed on a prepaid basis, however, the impact upon its traffic would, in the view of the trustees, be catastrophic.

15. The FRA stated that it will not replenish the amount of debtor's cash depleted by the trustees' payment of interline installments. N.T. 11; 20. As set forth in Finding No. 7, whether interline payments are made or not will have relatively little impact on Reading's ability to continue operations.

16. Although Reading has as yet received no federal funds, N.T. 21–22, the opposition of the FRA and the Department of Transportation to debtor's continuing to make interline payments is relevant, *In re Central Railroad Company of New Jersey, supra,* but not controlling.

17. Debtor has thus far received no funds from the Commonwealth of Pennsylvania, nor has the state made any payments for losses incurred in the operation of Reading's passenger service. The Commonwealth moreover expressed no position on the continuation of interline payments.

18. Debtor has negotiated a contract with the Southeastern Pennsylvania Transportation Authority (SEPTA), providing for the payment of $1,111,666. per month for six months to compensate Reading for its avoidable commuter costs. If these payments are not made, debtor's ability to continue its operations will be seriously jeopardized, but in that event, the withholding of interline payments would not have saved sufficient funds for Reading's services to continue.

## CONCLUSION

■ Weighing the above findings against each other, as the Court of Appeals directed the CNJ court to do, I conclude that the United States has failed to show any reason why Reading should not continue to meet its interline obligations through September, 1975. Accordingly, the petition of the United States will be denied, Order No. 865 will be vacated and dissolved, and the trustees will be allowed to make the interline payments due in July, August, and September of this year. This court will again consider the advisability of continuing to make interline installments in October, 1975.