In the Matter of READING COMPANY, Debtor.

In Proceedings for the Reorganization of a Railroad.

Petition of the UNITED STATES of America for an Order Directing the Trustees to Cease Making Deferred Interline Payments.

No. 71–828.

United States District Court, E. D. Pennsylvania, Civil Division.

Jan. 26, 1976.

James F. Dausch, U.S. Dept. of Justice, Jerome F. Sharfman, U.S. Dept. of Transp., Washington, D.C., for petitioner.

W. Charles Hogg, Jr., Edward C. Toole, Jr., Philadelphia, Pa., for The Committee of the Interline Railroads.

## OPINION AND ORDER NO. 992

DITTER, District Judge.

### I. INTRODUCTION

Pursuant to the mandate of the Court of Appeals in *In re Central Railroad of New Jersey*, 515 F.2d 506 (3d Cir. 1975) (Table),[1] and Order No. 880 in these proceedings, see *In re Reading Company*, 398 F.Supp. 280 (E.D.Pa.1975), a hearing was held on October 15, 1975, to determine whether the trustees of Reading Company should be permitted to make payments on account of deferred interline balances under Order No. 730 for the months of October, November, and December, 1975.

The facts giving rise to this ongoing controversy are set forth at length in Opinion and Order No. 880. Suffice it to say for present purposes that pursuant to the decision of the Court of Appeals for this Circuit in *In re Penn Central Transportation Company*, 486 F.2d 519 (3d Cir. 1973), cert. denied, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974),[2] representatives of the Reading and the Committee of Interline Railroads negotiated a settlement and schedule for payment of pre-bankruptcy interline funds. By Order No. 730, dated December 4, 1974, I approved the terms of that agreement.

The Court of Appeals in *In re Central Railroad of New Jersey*, supra, vacated an order of the CNJ reorganization court denying the Government's application for an order restraining the CNJ trustee from making deferred interline payments. In remanding the matter to the District Court, the appellate court said:

Factors that should be considered by the district court in determining the amount, if any, that should be paid on account of the interline balances still owing include these:

(A) projected income and expense estimates and cash flow for the month in which any payment is planned to be made and for future months, insofar as such estimates can be made;

---

1. When filed on May 9, 1975, the *per curiam* opinion of the Court of Appeals in *In re Central Railroad of New Jersey*, 515 F.2d 506 (3d Cir.) (Table) bore the designation "NOT FOR PUBLICATION." Subsequent to Opinion and Order No. 880 in these proceedings, see *In re Reading Company*, 398 F.Supp. 280 (E.D.Pa. 1975), at the request of the Government, and in the absence of objection from any other party, the Court of Appeals directed that the CNJ decision be published. Inasmuch as I fully considered and addressed the criteria enumerated in the CNJ decision in Opinion and Order No. 880, supra, the publication of the Court of Appeals' opinion has little practical impact here.

2. The gist of that decision was that interline balances, i. e., freight balances collected by one rail carrier for services performed by another, are held in trust and must be paid to their rightful owners.

(B) the effect which the proposed payments on account of the above-described interline balances will have on continued operation of CNJ in light of a plan of reorganization under the R.R.R.A., as well as on continued operation of B & O and C & O;

(C) the risk of CNJ's being placed on a prepay basis by B & O and C & O if it fails to pay these deferred balances and the hardship to CNJ of being placed on a prepay basis;

(D) the position taken by the Federal Railroad Administrator, the Secretary of Transportation, and the State of New Jersey concerning the proposed payment, in view of their regular payments to CNJ;

(E) whether payment of these deferred balances from funds paid to CNJ pursuant to Section 213 of the R.R.R.A. is consistent with the purposes of that section; and

(F) the extent to which the State of New Jersey is paying for the losses incurred in operating passenger service for the benefit of New Jersey residents and businesses. [footnote omitted].

*Id.* at 281.

Thereafter the Government petitioned this court for an order directing debtor's trustees to cease making installment payments on account of deferred interlines. Following a hearing on the Government's petition, I made findings of fact including, *inter alia,* that:

(1) Although the trustees had forecast a $1.1 million cash balance through July, 1975, and total receipts in excess of $20 million for the three-month period July-September, absent financial assistance from the federal government, the trustees forecast a cash shortage of $5.8 million as of the end of September (Findings Nos. 3, 6);

(2) From July to September, 1975, the debtor would receive in excess of $825,000 and approximately $1.1 million, respectively, under Sections 213 and 215 of the Re-gional Rail Reorganization Act of 1973 (RRRA), as amended, 45 U.S.C. §§ 723, 725 (Findings Nos. 4, 5); [3]

(3) Although discontinuation of deferred interline payments would not appreciably affect debtor's ability to continue operations, such discontinuation might well have an impact upon the operation of the Delaware & Hudson Railway Company (Findings Nos. 7, 8, 9);

(4) Although there was little likelihood of debtor's being placed on a prepay basis by other railroads for failing to make payments to the trust beneficiaries, the possibility existed that shippers and connecting lines would divert traffic, thus reducing Reading's revenues (Finding No. 11);

(5) The Federal Railway Administration (FRA) and the Department of Transportation contended that a cash shortage in the administration of Section 213 and 215 funds might occur in February or March 1976, and consequently were seeking to amass a "contingency fund." The Government failed to show, however, that the cessation of any RRRA railroad would result if payments were continued during July, August, and September, 1975 (Finding No. 13);

(6) The FRA stated that it would not replenish the amount of debtor's cash depleted by the payment of deferred interline installments (Finding No. 15);

(7) Debtor had thus far received no funds from the Commonwealth of Pennsylvania (Finding No. 17); and

(8) Debtor had negotiated a contract with the Southeastern Pennsylvania Transportation Authority (SEPTA), providing for the payment of $1,111,666. per month for six months to compensate debtor for its avoidable commuter costs. If such payments were not made, debtor's ability to continue operations would be seriously jeopardized. In that event, however, the withholding of interline payments would not conserve sufficient funds to enable Reading's services to continue.

---

**3.** As of that time, however, debtor had received no Section 213 or 215 funds from the Federal Railway Association (Finding No. 12).

On the basis of the above findings, I concluded that the Government had failed to show any reason why debtor ought not to continue—if the trustees saw fit in their discretion—to meet deferred interline deadlines through September, 1975. According to the mandate laid down in *In re Central Railroad Company of New Jersey*, supra, however, I specifically retained jurisdiction over this matter and directed that it be reconsidered as of October, 1975. Based on the record of the October hearing, I now make the following

## II. FINDINGS OF FACT

1. In the exercise of their discretion, debtor's trustees elected not to make payments on account of deferred interline balances for the months of July and August, 1975. The trustees did, however, make a deferred interline installment payment under Order No. 730 in September, 1975, of $275,000.

2. During the period July–September, 1975, debtor received $1.4 million in financial assistance under Section 215 of the RRRA to subsidize the Reading maintenance of way program.

3. In order to maintain its rail operations, debtor received $850,000. in Section 213 grants at the end of August, 1975.

4. Deferred interline balances falling due during the period October–December, 1975, totalled $1,375,000. (Exhibits 12, 17, 20).

5. During October, 1975, debtor expected to receive federal assistance under Section 215 in the amount of $286,000. (N.T. October 15, 1975, 18–19).[4]

6. Debtor projected total receipts of $62.2 million for the period October-December, 1975. Assuming federal assistance only for retroactive wages due in the last quarter, Reading predicted a cash balance of $8,000,000. at the end of October, 1975, and cash deficits of $400,000. and $4.8 million at the end of November and December, 1975, respectively (Exhibit 19). Assuming the receipt of Section 213 funds for back pay and Section 215 funds for program maintenance during the period in question, debtor projected cash balances of $2,442,-000., $3,043,000., and $572,000. at the end of October, November, and December, respectively (Exhibits 17, 21).[5]

7. Although debtor also predicted lower levels of expenses associated with projected declines in traffic levels, Reading nevertheless expected to require approximately $1.7 million in Section 215 funds and $3.6 million in Section 213 grant assistance in order to maintain its rail operations and at the same time meet all deferred interline balances, even if the trustees did not set aside funds to pay in the immediate post-conveyance period expenses of operations in the pre-conveyance period (Exhibits 17, 19, 20).

8. Assuming a conveyance date under the Final System Plan of March 1, 1976,[6] the trustees expect to experience a serious shortage between revenues and receipts collected in March, 1976 and expenses payable that month. Both revenues and expenses in March, 1976 will in part be attributable to rail operations in the pre-conveyance periods. This shortfall, which the trustees anticipate will exceed their projected March current interline payment of $7 million, can be met from only two sources: (1) Section 213 grant assistance from the FRA, and (2) revenues collected by debtor during the period October, 1975, through February, 1976 (Exhibits 12, 17).

9. According to the trustees cash forecast, if $1,375,000. is paid in deferred inter-

4. Unless stated to the contrary, all citations to notes of testimony refer to the October 15, 1975 hearing.

5. Although the final figures are as yet unavailable, subsequent events suggest that the actual cash balances for the last three months of 1975 will be shown to be far less auspicious than those which had been projected.

6. I shall take judicial notice of the fact that the final system plan was approved by Congress, as prescribed in the Regional Rail Reorganization Act of 1973, on November 9, 1975. See Rule 201(b), (c), and (f), Fed.R.Evid. Since that time, however, there have been indications that the conveyance date may well have to be postponed some two to four months.

line balances for the last quarter of 1975, and even if no funds are set aside for pre-conveyance expenses payable in March, 1976, debtor will experience cash deficits of $928,000. in January, 1976, and $672,000. in February, 1976 (Exhibit 20).

10. Even should FRA be able to supply Reading with Section 213 grants to cover certain pre-conveyance operating expenses payable in the post-conveyance period, FRA's declared policy is to exclude any payments of pre-bankruptcy deferred interline balances by the trustees in computing the amount of Section 213 assistance necessary for the railroad to continue operations.[7]

11. The Delaware & Hudson Railway Company, the only solvent railroad in the heavily populated areas of the Northeast, was owed some $85,000. in interline funds by Reading in July, 1975. Having experienced a loss of over $1 million during the first six months of 1975, the Delaware & Hudson is in an extremely precarious financial position, and the diminution of cash needed for its operations would to some degree be ameliorated by debtor's interline payments (N.T., July 14, 1975, 140–43; Affidavits of Robert E. Sullivan, Donald F. Luke).

12. The Lehigh Valley Railroad Company, which like Reading is in reorganization, had a net loss of $10 million for the first six months of 1975, affidavit of Donald F. Luke, and was owed in excess of $40,000. by debtor in deferred interlines in July, 1975. Any deferred interline payments debtor makes to Lehigh Valley will diminish accordingly the amount of funds that line must seek from the Government (N.T., July 14, 1975, 146; affidavit of James W. McConnell).

13. Notwithstanding their failure to make deferred interline installment payments in July and August, 1975, the trustees neither received any complaints from large shippers or connecting carriers, nor proffered any evidence of consequent loss or diversion of business.

14. Debtor has not been threatened by any interline carrier with being placed on a prepay status if it fails to meet future interline installments. In any event, little likelihood exists that a carrier would be able to sustain a prepay tariff against the Reading with the Interstate Commerce Commission. See *In re Reading Company*, supra, 398 F.Supp. at 283.

15. Because debtor had already received as of August, 1975, $850,000. in Section 213 grant assistance and would continue to need Section 213 assistance substantially in excess of $1.4 million during the last quarter of 1975 and during January and February, 1976, the Federal Railroad Administrator and the Department of Transportation urge

---

7. The question of whether the FRA policy is a "reasonable term or condition" within the meaning of Section 213 of the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. § 723, see note 9 infra, for the receipt of assistance is not presently directly at issue before this court. While I accordingly express no opinion on that issue, I find it of more than passing significance that the Court of Appeals has both expressly and by implication demonstrated that its decision in *In re Penn Central Transportation Company*, note 2 supra, does not impose an absolute obligation to repay deferred interline balances when the trustees' own cash resources are insufficient to permit them both to do so and to continue their operations pending effectuation of the final system plan.

In the Penn Central interlines case itself, the Court of Appeals, after a petition for rehearing by the Penn Central trustees, modified its original opinion, which called for immediate payment of deferred balances, to a remand to the reorganization court for further proceedings consistent with the remainder of the opinion. Although the court offered no explanation for this substantial change, it apparently came in response to the trustees' claim that the line would cease operations for lack of cash if the requirement of immediate payment were enforced. Additionally, the majority opinion in that case evidenced the court's belief that its decision was consonant with the "congressional policy encouraging interline rail transportation of freight and passengers nationwide," 486 F.2d at 527; see also *id.* at 531–33 (Adams, J., concurring). And in its *CNJ* decision, the Court of Appeals expressly recognized the right of the Government to challenge deferred interline payments when "such payments would jeopardize CNJ's continued operations, *In re Central Railroad of New Jersey*, supra note 1, slip op. at 55.

that the trustees can and should, consistent with their "best efforts" obligation under Order No. 730 [8] and the Court of Appeals' decision in *In re Central Railroad of New Jersey,* supra, refrain from paying deferred interline balances under Order No. 730 for the periods October–December, 1975, and January–February, 1976 (Proposed Finding No. 24 of the United States of America).

16. Although it receives no payments from the Commonwealth of Pennsylvania, debtor has a contract with the Southeastern Pennsylvania Transportation Authority (SEPTA), a state authority, under the terms of which SEPTA pays Reading $1,100,000. per month for the cost of operating its suburban passenger service. The payment of interline installments would not directly affect such service, and the Commonwealth has taken no position with respect to the instant petition.

■ 17. Section 213 of the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. § 723,[9] "is a grant, pure and simple, just to try to keep the railroads going . . .." [10] To the extent that the payment of deferred interlines would imperil Reading's ability to maintain its present level of services, it would concomitantly conflict with the purpose of Section 213. See note 7 supra.

## III. DISCUSSION

The present question is far closer than that presented in July, 1975. As the conveyance date draws near, Reading's projected financial condition has deteriorated alarmingly. It is abundantly apparent that in order to maintain its operations at their current level, as it must, debtor has needed and will continue to need substantial federal assistance in the form of Section 213 grants. Because the propriety of the FRA's policy of refusing to recognize payments of pre-bankruptcy deferred interline balances in computing the amount of Section 213 assistance to enable debtor to continue operations is as yet judicially undecided, see note 7 supra, and indeed is likely to remain undecided as of the projected conveyance date, the impact of that policy must of necessity weigh heavily in my disposition of this matter. Both the foregoing factors, as well as the unlikelihood of Reading's being placed on a pre-pay basis and the absence of complaints from either large shippers or connecting carriers as a result of the trustees failure to make the July and August installments, suggest prohibiting the trustees from making future payments. On the other hand, the trustees' prudent exercise of their discretion in July and August, coupled with the benefits which would inure to the Delaware & Hudson and Lehigh Valley if deferred interline installments could be made without jeopardizing debtor's continued operations, weigh in favor of denying the Government's petition. The consonance of allowing future payments with the purposes of Section 213 is uncertain and the Commonwealth's position is neutral.

8. See *In re Reading Company,* supra, 398 F.Supp. at 282.

9. Section 213(a) provides:

Emergency assistance.—The Secretary is authorized, pending the implementation of the final system plan, to pay to the trustees of railroads in reorganization such sums as are necessary for the continued provision of essential transportation services by such railroads. Such payments shall be made by the Secretary upon such reasonable terms and conditions as the Secretary establishes, except that recipients must agree to maintain and provide service at a level no less than that in effect on January 2, 1974.

10. 119 Cong.Rec. § 22, 485 (daily ed. Dec. 11, 1973) (remarks of Sen. Hartke, the floor manager of the rail bill in the Senate); see 119 Cong.Rec. § 23, 778 (daily ed. Dec. 21, 1973) (remarks of Sen. Hartke); Conference Report, H.R.Rep. No. 744, 93d Cong., 1st Sess. 213 (1973).

Although the legislative history is replete with references to Congress's intent that Section 213 be used to enable railroads in reorganization to maintain a stable level of services, until a final plan was devised, adopted, and effectuated, see, e. g., 119 Cong.Rec. § 22, 485 (daily ed. Dec. 11, 1973); 119 Cong.Rec. H.R. 9, 731 (daily ed. Nov. 8, 1973); S.Rep. No. 601, 93d Cong., 1st Sess. 31, 76 (1973); H.R.Rep. No. 620, 93d Cong., 1st Sess. 14, 57 (1973), U.S.Code Cong. & Admin.News 1973, p. 3242, nowhere does it specifically preclude the use of Section 213 funds for payment of deferred interline balances.

## IV. CONCLUSION

 Having considered the foregoing factors, I have again decided to deny the Government's petition. This time, however, I deem it best to provide the trustees with clear guidelines within which they may exercise their discretion concerning the payment of deferred interline balances. Specifically, I am directing the trustees to make such payments *for* October, November, and December *if an only if*—in light of the FRA's position on the calculation of Section 213 grants—they can do so without in any way jeopardizing debtor's ability to continue operations until the final system plan takes effect.

The trustees are *not* to base their decision on the theory that because the interline balances are a relatively small portion of debtor's overall fiscal posture, whether or not they are paid will not be crucial to Reading's solvency.

I shall again consider this matter in February, 1976.

### ORDER NO. 992

AND NOW, this 26th day of January 1976, after a hearing in this court and careful consideration of the briefs of counsel on the petition of the United States for an order directing the trustees to cease making deferred interline installment payments pursuant to Order No. 730 in this proceeding, it is Ordered that:

1. The petition of the United States is hereby denied;

2. The trustees shall be allowed to make payments falling due under the interline agreement for October, November, and December, 1975, only if, in view of the Federal Railway Administrator's policy of refusing to recognize any payments of pre-bankruptcy deferred interline balances in calculating grants under Section 213 of the Regional Rail Reorganization Act, as amended, 45 U.S.C. § 723, they are able to do so without in any way jeopardizing debtor's ability to continue operations at their present level until the final system plan takes effect. The trustees shall not base their decision on the belief that because interline balances are a relatively small portion of debtor's fiscal posture, whether or not they are paid is not to crucial to Reading's solvency.

3. This matter is again set down for hearing at 9:30 A.M. on February 5, 1976, in Court Room 6A, United States Courthouse, Independence Mall West, Philadelphia, Pennsylvania.